**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 16 2014, 9:52 am

Kevin S. Smith

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**LEANNA WEISSMANN**
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JEREMY DALLAS JENKINS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 15A01-1405-CR-225 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE DEARBORN SUPERIOR COURT
The Honorable Jonathan N. Cleary, Judge
Cause No. 15D01-1304-FB-14

**December 16, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Following a bench trial, Jeremy Dallas Jenkins appeals his conviction for Class B felony burglary[1] and raises the following two restated issues:

I.  Whether the trial court erred when it admitted into evidence police testimony that the victim's neighbor made a pointing gesture at the ceiling while talking to police; and

II.  Whether Jenkins's sixteen-year sentence is inappropriate.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On March 1, 2013, Candida Haney ("Haney") and her two children, ages two and four, moved into Apartment 211 of an apartment complex in Lawrenceburg, Indiana. On the evening of March 26, 2013, Haney entered her apartment, after having been away a couple of days, to find a number of things were out of place or missing. Her DVD player had been moved from the television stand and was placed on the arm of her couch, and her Gateway laptop computer, wireless mouse, and charger were missing. Other items she later discovered missing were a Hello Kitty brand first aid kit, two sets of necklaces and earrings purchased from Wal-Mart, a camera, several Victoria's Secret body sprays, a pack of Marlboro Lights 100s cigarettes taken from a now-empty carton in her closet, and a Mickey Mouse watch. Haney also notice that the thermostat in her apartment was set at a high temperature.

Haney promptly contacted police, and she stayed in her living room until police arrived at 8:25 p.m. Lawrenceburg Police Department Officer Daniel Rosengarn

---

[1] *See* Ind. Code § 35-43-2-1(1). We note that, effective July 1, 2014, a new version of this criminal statue was enacted. Because Jenkins committed his crime in 2013, we will apply the statute in effect at that time.

responded, gathered information from Haney, and told her to call him later if she found that any more items were missing or out of place.

Haney worked the third shift at her job, 10:00 p.m. to 6:00 a.m., and as she was getting ready for work on March 26, she noticed in her closet that the shelving rack, normally positioned above her hanging clothes, was broken and some articles of clothing had fallen to the floor. She proceeded to go to work, but she called Officer Rosengarn at approximately 11:30 p.m. and reported to him that she had found her closet in disarray. Officer Rosengarn passed on the information to Detective Jeremy Shepherd.

The next morning, after Haney returned home from work, she contacted the apartment complex's maintenance manager, Tom Allen, asking him to change the door locks. Allen came to Haney's apartment and inspected the door lock, which appeared in normal working condition. Haney then asked Allen to view her closet. Allen noticed the broken rack and "somebody's footprint [] right on it," and he saw that a small wooden dresser placed under the rack also was broken. *Tr.* at 157. The access to the attic was through the ceiling of Haney's walk-in closet, and Allen saw insulation on the closet floor under the access. Allen told her to call police.

Haney made contact with Detective Shepherd, who arrived at Haney's apartment shortly thereafter. Detective Shepherd saw the broken shelf in the closet and drywall and insulation on the floor under the access to the attic in Haney's closet ceiling. Haney discussed with him the various missing items and also noticed that a Febreze candle that had been on top of the refrigerator was now on the closet floor. While police were on the premises, Allen climbed on a ladder and looked through the attic access to see that the

3

drywall between Haney's apartment and Apartment 212, next door, had been broken through, leaving a large hole. After speaking to Allen, Detective Shepherd looked in the attic and could see that "there was a hole busted into to gain access into another apartment through the attic." *Id*. at 67. The attic space above the four upstairs apartments was divided by fire walls, such that a person "[could not] get into another one unless you break through the drywall." *Id*. at 80.

Thereafter, Detective Shepherd and another officer made contact with the resident in Apartment 212, Shawna Henry, who was Jenkins's wife and the official occupant of the apartment, although Jenkins stayed at the apartment sometimes to visit his children. Henry stepped out of her apartment and spoke to Detective Shepherd in the hallway for a few moments. After that brief conversation, and with her permission, officers entered Apartment 212. Detective Shepherd noticed on the kitchen counter a pack of Marlboro Lights 100s cigarettes, the same type as those missing from the carton in Haney's closet. Henry accompanied Detective Shepherd to the police department for an interview. Based upon Henry's interview with police, combined with what police had seen at the apartment and in the attic, they believed that Jenkins was in the attic, so officers set up "a perimeter," in order to "flush out" Jenkins.[2] *Id*. at 77. Later that day, after other officers arrived at the scene, including a K-9 officer, Jenkins was apprehended when he emerged from the attic into Apartment 213, a vacant upstairs apartment.

---

[2] The residents of the upstairs apartments were asked to exit and wait in the parking lot during this time. When asked to leave, the male resident of Apartment 214 told police that he had been asleep in bed earlier that day, when he was awakened to the sound of someone trying to gain access to his apartment through the attic.

Officers patted down Jenkins and found a pack of Marlboro Lights 100s cigarettes believed to be that which Detective Shepherd had seen on the counter when he entered Apartment 212, and which officers suspected came from the now-empty Marlboro Lights 100s carton in Haney's closet.[3]  In the attic, police recovered, among other things, a backpack, which contained a laptop computer, a black charging cord, and a red computer mouse, all of which belonged to Haney.  Next to the backpack was a black coat, which belonged to Jenkins.  Upon investigation of Henry's apartment, police located in a laundry hamper various items belonging to Haney, including the three bottles of Victoria's Secret body spray, the Walmart jewelry, and the Hello Kitty first aid kit.  Jenkins identified shoes in Henry's apartment as being his, and he told police he was staying at Henry's apartment at that time, in order to see his children.

The State charged Jenkins with Class B felony burglary, Class D felony theft, and Class A misdemeanor criminal mischief.  At the bench trial, Detective Shepherd testified, over Jenkins's hearsay objection, that, while he was speaking to Henry in the hallway outside of her apartment's front door, he asked her if she knew anything about the burglary at the apartment next door, and in response, she made a hand gesture toward the ceiling or attic area above where they were standing.  Thereafter, with Henry's permission, officers entered her apartment.  With officers later positioned in each of the four upstairs apartments, they could hear that there was someone going from apartment to apartment in the attic space, although the only person who possessed permission to go into the attic

---

[3] During the course of the investigation, police learned that neither Jenkins nor Henry smoked Marlboro Lights 100s; Jenkins generally smoked menthols, and his wife, Henry, smoked Marlboro Reds. *Tr.* at 178.

space was Allen.

Allen testified that, at the request of police, he went to Apartment 212 to retrieve the ladder, when he noticed that the ladder had been moved from where it had been and that the shower curtain had been pulled shut. He pulled back the shower curtain and found Jenkins standing there. Allen attempted to take Jenkins to police, but Jenkins retreated back into the attic. The police K-9 officer was summoned to the scene, with the plan to send the K-9 into the attic area, but once the K-9 and his partner arrived and were ready to enter the attic through Apartment 212, Jenkins came out of the attic into Apartment 213. Sometime after Jenkins was apprehended, Allen returned and inspected the attic space and found the fire walls between four upstairs apartments – 211, 212, 213, and 214 – had been damaged. Detective Shepherd found insulation below the ceiling attic access in each of the four apartments. *Tr.* at 177.

Detective Shepherd testified that, prior to trial, police actively attempted to locate Henry to serve a summons to testify at trial, but were unable to locate her. During the course of those attempts, Detective Shepherd became aware of some recorded jail telephone calls between Jenkins and his mother, in which Jenkins stated to his mother that he needed her to keep Henry "occupied" or "away from here" so that Henry would not appear in court to testify. *Id.* at 95, *State's Ex.* 15. Jenkins's statements in those taped those phone calls were admitted at trial. *Tr.* at 106.

The trial court found Jenkins guilty as charged, but the trial court vacated the theft and criminal mischief convictions on double jeopardy grounds. At the subsequent sentencing hearing, the trial court found in aggravation that (1) Jenkins used the attic area

6

to gain access to residents' homes by "cutting holes" and "moving about" in the attic space "and then drop into the apartments"; (2) Jenkins called his mother from jail and attempted to obtain her help in keeping witnesses from testifying at his trial; (3) Jenkins has an extensive criminal history, including four felonies and six misdemeanors; (4) Haney and her two young children no longer feel safe in their home. *Id.* at 235, 238. In mitigation, it found that (1) Jenkins has two young children; (2) he suffers from seizures; and (3) he waived a jury trial and saved resources and expense. Thereafter, the trial court sentenced Jenkins to sixteen years of incarceration for the Class B burglary conviction. Jenkins now appeals.

## DISCUSSION AND DECISION

### I. Hearsay

Jenkins argues that the trial court erred when it permitted into evidence, over his objection, Detective Shepherd's testimony that Henry pointed to the attic when he was speaking with her in the hallway outside her apartment. Jenkins claims that this gesture constituted hearsay and was inadmissible. The trial court's discretion to admit or exclude evidence is broad, and it will not be reversed absent an abuse of that discretion. *Sandefur v. State*, 945 N.E.2d 785, 788 (Ind. Ct. App. 2011). The trial court abuses its discretion if its evidentiary ruling is clearly against the logic, facts, and circumstances before it. *Id.*

As a general rule, hearsay evidence is inadmissible. Ind. Evidence Rule 802.[4] Hearsay is defined as an out-of-court statement offered in court to prove the truth of the

---

[4] Indiana's evidence rule were slightly re-worded effective January 1, 2014, but the changes affect only style and not substance.

matter asserted. Ind. Evid. R. 801(c). A "statement" is defined as (1) an oral or written assertion, or (2) nonverbal conduct of a person, if it is intended by the person as an assertion. Evid. R. 801(a); *Pritchard v. State,* 810 N.E.2d 758, 760 (Ind. Ct. App. 2004). To be an assertion, a statement must allege a fact susceptible of being true or false. *Pritchard*, 810 N.E.2d at 760.

The statement that Jenkins challenges is the police officer's testimony that described Henry's nonverbal gesture of pointing to the ceiling or attic area after he asked her if she knew anything about the burglary that had occurred in her next-door neighbor's apartment. The State maintains that the gesture was not hearsay and was an observation that the officer made, admitted to describe the course of the police investigation. When the admissibility of an out-of-court statement received by a police officer during the course of an investigation is challenged as hearsay, we first determine whether the testimony describes an out-of-court statement that asserts a fact susceptible of being true or false. *Corbally v. State*, 5 N.E.3d 463, 469-70 (Ind. Ct. App. 2014); *Vertner v. State*, 793 N.E.2d 1148, 1151 (Ind. Ct. App. 2003). If the statement contains no such assertion, it cannot be hearsay and the objection should be overruled. *Stewart v. State*, 945 N.E.2d 1277, 1287 (Ind. Ct. App. 2011). If the statement does contain an assertion of fact, we consider the evidentiary purpose of the proffered statement. *Id*. If it is to prove the truth of the matter asserted, then it is inadmissible as hearsay unless there is an applicable exception. *Id*. On the other hand, if the statement is offered for a purpose other than to prove the truth of the matter asserted, "courts must consider whether the fact to be proved is relevant to some issue in the case and whether the danger of unfair prejudice that may result from its admission

8

outweighs its probative value." *Corbally*, 5 N.E.3d at 470. We are cognizant of the fact that, sometimes, Indiana courts have viewed the State's efforts to introduce police officer testimony relating to out-of-court statements "under the guise of 'course-of-investigation' evidence" with skepticism due to the possibility of its misuse, but we find no misuse or error in the present case. *Id*.

Over Jenkins's hearsay objection, the trial court admitted the evidence that, while speaking to officers in the hallway outside of her apartment, Henry "pointed to the upstairs, the attic area[.]" *Tr*. at 73. The Detective's statement was not offered to prove the truth of the matter asserted, nor was it a statement that alleged a fact susceptible of being true or false. Henry's gesture did not identify Jenkins as the perpetrator. Rather, the Detective's testimony concerning Henry's pointing gesture explained the subsequent conduct of the police officers, *i.e*., their investigation of the attic of the apartment building to ascertain or apprehend a suspect. We find that the trial court properly concluded the gesture was not hearsay and was admissible. *Compare Sandefur*, 945 N.E.2d at 788 (officer's testimony that victim had mouthed words "he hit me" to officer was offered to prove truth of matter asserted, namely that Sandefur had hit victim, and constituted hearsay, although ultimately admissible under excited utterance exception).

Even if Detective Shepherd's testimony may be characterized as hearsay, its admission was harmless error. When reviewing whether the erroneous introduction of evidence was harmless, we must consider whether the evidence was likely to have substantially swayed the jury's verdict. *Corbally*, 5 N.E.3d at 470. The improper admission of evidence is harmless error if we are satisfied that the conviction is supported

9

by such substantial independent evidence of guilt that there is little likelihood the challenged evidence contributed to the conviction. *Id.* In this case, before Detective Shepherd went to speak to the occupant of Apartment 212, Haney, Allen, and Detective Shepherd each observed insulation scattered on floor of Haney's closet, directly under the ceiling access to the attic. There was a footprint on Haney's closet rack, now broken, indicating someone had climbed in and out of her attic using it as a step. When Allen, and later Detective Shepherd, looked into the attic from Haney's closet access, each of them observed that a hole had been punched through the drywall that divided the attic space above Haney's Apartment 211 and the apartment next door, Apartment 212. Thus, the genesis of the investigation of the attic was not based solely on any pointing gesture made by Henry to Detective Shepherd. Indeed, plenty of other evidence indicated that whoever had entered Haney's apartment did so via her attic access in her closet and that someone had broken through the firewall dividing the apartments in the attic space. It was after making the discovery of the hole in the attic drywall leading to Apartment 212 that Detective Shepherd knocked on the door of Apartment 212 and spoke to Henry. More police officers were called to the scene, and they heard someone running back and forth in the attic area. At one point, Allen discovered Jenkins hiding in the shower behind a closed curtain in Apartment 212. Although Allen tried to persuade Jenkins to speak with police, Jenkins climbed into the attic, and he re-appeared when a K-9 officer arrived on the scene and prepared to enter the attic. Once officers entered the attic, they found Jenkins's coat and a backpack containing items belongings to Haney, and they found in Henry's apartment, where Jenkins was staying, more items belonging to Haney. We are satisfied

10

that Jenkins's burglary conviction is supported by such substantial independent evidence of guilt that there is little likelihood the challenged evidence contributed to the conviction. The trial court did not err in admitting Detective Shepherd's testimony.

## II.    Sentencing

Jenkins claims that his sixteen-year sentence is inappropriate. Under Indiana Appellate Rule 7(B), this "Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed in inappropriate. *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008) (emphasis in original). In performing our review, we assess "the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State,* 895 N.E.2d 1219, 1224 (Ind. 2008). We understand and recognize the unique perspective a trial court brings to its sentencing decisions. *Corbally*, 5 N.E.3d at 471. It is the defendant's burden on appeal to persuade the reviewing court that the sentence imposed by the trial court is inappropriate. *Chappell v. State*, 966 N.E.2d 124, 133 (Ind. Ct. App. 2012), *trans. denied*.

For his Class B felony burglary conviction, Jenkins faced a sentencing range of six years to twenty years, with the advisory sentence being ten years. *See* Ind. Code § 35-50-2-5.; *Hall v. State*, 944 N.E.2d 538, 541 (Ind. Ct. App. 2011), *trans. denied*. Here, the trial court sentenced Jenkins to sixteen years. Jenkins asks us to revise his sentence to the ten-year advisory term, suggesting that would fit the circumstances of his offense where he

"snuck into an unoccupied apartment and took a laptop and items of small pecuniary value" and "[n]o one was injured and the items were all returned, undamaged." *Appellant's Br.* at 14.

With regard to the nature of the offense, we disagree with Jenkins's characterization of the apartment as being "unoccupied." Haney and her two small children resided there, having just moved in weeks prior, and to that extent, the apartment was indeed occupied, with the occupants simply being not at home when Jenkins snuck into Haney's apartment and took a number of her possessions. As the trial court found in aggravation, Jenkins's conduct effectively robbed Haney and her children of a feeling of safety and security in their home. The trial court also recognized the covert manner of entry into Haney's apartment, through the attic access in her bedroom closet, and that the evidence further showed that Jenkins had been "moving about" in the attic and "dropping into" other apartments in this same fashion, all of which added to the culpability and severity of the nature of the offense. *Tr.* at 235, 238. Jenkins has failed to persuade us that the nature of the offense warrants revision of his sentence.

Moving next to the question of character, evidence at trial established that on at least several occasions Jenkins, in recorded telephone calls from jail, tried to prevent witnesses from testifying at his trial. This obviously reflects poorly on his character. His criminal history, which the trial court considered "significant," likewise does not reflect positively on his character. *Id.* at 238. By age thirty-four, Jenkins had amassed four felony convictions, six misdemeanor convictions, and four probation violations. Jenkins suggests that we should reduce his sentence because he is "a drug addict capable of redemption."

12

*Appellant's Br.* at 13. As the State observed, Jenkins never fully acknowledged having a substance abuse problem. The probation officer's report in the presentence investigation report indicated that Jenkins denied any addiction; at sentencing, Jenkins conceded that he "had involvement" with marijuana and continued, "I've dabbled in other things, but prefer not to go into it." *Tr.* at 212. There is no indication in the record that Jenkins ever sought treatment. His character does not demonstrate that his sixteen-year sentence was inappropriate. Jenkins has failed to persuade us that the sixteen-year sentence is inappropriate in light of the nature of the offense and the character of the offender.

Affirmed.[5]

BAKER, J., and ROBB, J., concur.

---

[5] Although aggravating or mitigating circumstances generally are not independently addressed in an inappropriate sentence analysis, we nevertheless wish to note that, here, the trial court identified as a mitigator that Jenkins waived his right to a jury trial. While Indiana courts have recognized that defendants who plead guilty deserve "some" mitigating weight be given to the plea, our colleague Judge Bradford determined, and we agree, that waiver of right to a jury trial is not analogous to a guilty plea. *McSchooler v. State*, 15 N.E.3d 678, 685 (Ind. Ct. App. 2014) (citing *Anglemyer v. State*, 868 N.E.2d 482 (Ind. 2007), *modified on other grounds on reh'g*, 875 N.E.2d 218, 220 (Ind. 2007)). "Although the State is saved some expense in both circumstances, a guilty plea often demonstrates a defendant's acceptance of responsibility, whereas waiver of jury trial does not." *Id.*; *see also Cotto v. State*, 829 N.E.2d 520, 525 (Ind. 2005) (guilty plea is not considered significant mitigating factor solely because it saves time and expense, as it must also demonstrate defendant's acceptance of responsibility for the crime). Judge Bradford concluded that "in some cases" it may be appropriate to accord waiver of jury trial mitigating weight, but McSchooler had failed to establish it in his case. *McSchooler*, 15 N.E.3d at 685. While we agree with Judge Bradford's conclusion that a guilty plea and waiver of jury trial are not analogous, we are troubled by the proposition that waiver of one's right to trial by jury ever might be considered a valid mitigating factor. We find that doing so could amount to an inducement to waive a fundamental constitutional right, as well as bring into question whether the waiver was voluntarily made. *See e.g.*, *People v. Dixon*, 63 Cal. Rptr. 637, 644 (Cal. Ct. App. 2007) (recognizing trial court's pre-trial statement to defendant that waiver of jury trial would be considered a mitigating factor at sentencing was "an improper promise of a benefit for waiving a fundamental constitutional right"), *review denied*. Accordingly, we caution trial courts about considering waiver of right to trial by jury as a mitigator.